IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 5, 2019

**STATE OF TENNESSEE v. JOCELIN WILLIAMS[1]**

**Appeal from the Criminal Court for Shelby County**
No. 15-06145        Lee V. Coffee, Judge

_____

**No. W2018-00797-CCA-R3-CD**

_____

A Shelby County jury convicted the Defendant-Appellant, Jocelin Williams, of first-degree, premeditated murder of Delvin Brown, the victim in this case. She was also convicted of murder during the perpetration of robbery, especially aggravated robbery, and theft of property valued over $500. The trial court merged the murder convictions and imposed an effective sentence of life plus twenty years' imprisonment. In this appeal as of right, the Defendant presents the following issues for our review: (1) whether the trial court erred in denying her motion to suppress a statement which was given while she was alleged to have been impaired; and (2) whether the evidence adduced at trial was sufficient to support her convictions of first-degree murder and especially aggravated robbery. Upon our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Shae Atkinson (on appeal) and Juni S. Ganguli (at trial), Memphis, Tennessee, for the Defendant-Appellant, Jocelin Williams.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carolyn Alanda Dwyer, Assistant District Attorney General, for the Appellee, State of Tennessee.

---

[1] The Defendant's name is spelled alternatively throughout the record as "Jocelyn Williams" and "Jocelin Williams." We will use the name "Jocelin Williams," as charged in the indictment. The Defendant was tried jointly with co-defendant Robert Belt.

# OPINION

The Defendant devised a plan to rob the victim, a known drug dealer, which ultimately led to the victim's death. On the night of the offense, the Defendant called Shuntavia Louden, the victim's girlfriend, and asked if the victim would sell the Defendant some marijuana. Louden believed the victim would, and she agreed to go to the victim's home along with the Defendant and her boyfriend, Robert Belt. While at the victim's home, they watched a basketball game, smoked marijuana, and drank alcohol. An hour or so later, co-defendant Belt struck the victim in the head with a large, glass, Grey Goose bottle of alcohol. A struggle ensued between the co-defendant and the victim, which led them from the living room to the kitchen. Once in the kitchen, the victim was stabbed in the neck with a screwdriver and bludgeoned to death by the Defendant, who repeatedly struck him in the head with a hammer. As the victim lay dying on the floor, the Defendant ransacked the victim's home and took a PlayStation 3 gaming system and a Samsung IPad tablet. Following an investigation, the Defendant provided a statement of admission regarding her involvement in the victim's death. She was subsequently indicted for the above offenses.

Prior to trial, the Defendant filed a motion to suppress her statement, arguing that it was given while she was illegally detained and therefore in violation of her Fourth Amendment rights. She also argued that the statement violated her Fifth Amendment right to remain silent because it was involuntary. She claimed she had smoked marijuana sometime before the statement was given, was intoxicated, and became sick during the statement. As relevant to the issues raised in this appeal, the proof adduced at the motion to suppress was as follows.[2] Officer Fausto Frias testified that he had received information that the Defendant, Robert Belt, and Shuntavia Louden, were the last three people to have been seen with the victim before his death. Based on this information, Officer Frias proceeded to 6935 Red Oak Circle, Apartment 28 [hereinafter the Redmond apartment], where the Defendant and co-defendant lived, and recovered several items including a handgun, an IPad, and a PlayStation 3 gaming system that were determined to have been taken from the victim's apartment.

Sergeant Robert Wilkie testified that he was employed with the Memphis Police Department (MPD) and became involved with the investigation of the victim's death on April 26, 2015, at approximately 2:25 a.m. He identified the Defendant at the hearing and explained that he had reviewed an Advice of Rights form with her. He said prior to explaining the Advice of Rights form to her, the Defendant advised him that she had "one

---

[2] The motion to suppress was jointly conducted for the Defendant and co-defendant, Robert Belt. There were multiple issues addressed including whether the search and seizure of the Defendants were supported by probable cause. These issues are not raised in this appeal.

blunt of marijuana about 11:00 p.m. but was not feeling the effects of it at the time when we talked to her." He continued to obtain the Defendant's date of birth, her level of education, and did not observe anything about her that indicated she was under the influence of marijuana or alcohol. He testified that she read her rights aloud to him with "no problem, except for the word, 'coercion.'" Asked to explain, Sergeant Wilkie said that the word coercion was pronounced correctly, that the definition of coercion was provided for the Defendant, and that she said she understood it. The Defendant signed the Advice of Rights form at 2:26 a.m. and agreed to talk with the investigators. The Advice of Rights form was admitted as an exhibit to the hearing. After about ten or fifteen minutes, the Defendant asked Sergeant Wilkie to leave the room, and he obliged. Sergeant Wilkie testified that a statement was taken from the Defendant by Sergeant Kelly and Sergeant Burton.

On cross-examination, Sergeant Wilkie confirmed that the Defendant advised him that she had smoked marijuana three hours prior to talking with him. He did not ask the Defendant how often she smoked marijuana, the size of the blunt she smoked, or how much marijuana was in the blunt. He denied that the Defendant's behavior was unusual; but he agreed that when she heard the words "homicide" or "first degree murder" she did not appear to be "fazed" by them. Sergeant Wilkie explained that he did not consider her reaction to be unusual because "[a]bout half of the people [investigated for homicide] are not fazed at all." He agreed that the Defendant behaved in a jovial manner, was "friendly" during the statement, and did not appear to be "all that concerned with what we were talking about." He agreed that he spoke with the Defendant for approximately forty minutes.

Sergeant Eric Kelly testified that he took a statement from the Defendant pertaining to her involvement in this case, which was admitted as an exhibit to the hearing. He was aware that the Defendant had previously advised Sergeant Wilkie that she had smoked marijuana, but she was not feeling the effects of it. Sergeant Kelly did not observe anything about the Defendant's behavior which indicated that she was impaired by drugs or alcohol use. He testified that they also had a discussion concerning whether she was under the influence, which was standard procedure to ensure she was "clear headed" and in the "right frame of mind." He did not promise the Defendant anything in exchange for her statement and did not coerce her into providing the statement. He testified that the Defendant explained her role in the homicide to him. She did not initially tell him the truth and provided a "self-serving statement," which meant she left herself out of any active role pertaining to the death of the victim. After Sergeant Kelly explained the varying degrees of murder and the potential penalties for them, the Defendant told him "she didn't want to be involved with something that involved her being in jail for the rest of her life. She implied that she was pregnant at that particular time and wanted to be able to raise a child." Sergeant Kelly said that he told her that if

- 3 -

she felt this way, then "it would be best for her to be truthful about the matter." The Defendant then provided the following statement:

Q: Having these rights in mind, do wish to talk to us now?
A: Yes. [Defendant's initials]

Q: Are you aware the Memphis Police Department is investigating the death of [the victim]?
A: Yes.

Q: Were you present when [the victim] died?
A: I don't know if he died or not but I guess I was.

Q: Who else was present when [the victim] was killed?
A: Shuntavia, I don't know her last name and Robert Belt.

Q: What is your relationship to Robert Belt?
A: We are dating, he is my boyfriend for the last 4 or 5 months.

Q: Who is Shuntavia?
A: I guess you can call her a friend, we are kind of distant, I guess you can say an associate.

In your own word[s], explain the events that took place prior, during and after this incident?

Shuntavia had called and said she was going over to the victim's house. She asked me and Robert if we wanted to go over there with her to buy some weed and smoke it. The 3 of us rode over to his house in my car. Shuntavia told me how to get there because I didn't know where he lived. We went in and there was some other people there and we all smoked weed with them. At some point they all left and it was just Shuntavia, Robert, me and the victim. Me and Robert bought some weed from him and then we left. Shuntavia was texting Robert stuff and I was just driving around and we went somewhere and parked. Then we came back smoked some more weed and then it just happened. I think he was sitting down when Robert picked up the bottle and Robert hit him in the head. I don't know if it was the front or the back it all happened so fast. Robert and the guy started wrestling. While they were wrestling Shaun was grabbing stuff. I saw that the guy was reaching for the gun in his pocket so I tried to grab it first but I could not get it. Shun was trying to grab the gun too but she was saying she

couldn't get it. I picked up a toolbox and handed it to Robert and he hit the guy over the head with it. I don't know what happened after that because I started picking up stuff. I picked up a computer tablet and a PlayStation. Shun picked up nothing much except money and weed. After that we all left together and I drove to a hotel and got a room in my name for the 3 of us. The name of the hotel I don't know because I don't know Memphis that well. Once in the hotel the three of us split stuff up; Shuntavia took money and some of the weed. Robert the 2 guns, the tablet, the gaming system with 2 remotes. I took a shower and we smoked a blunt together. The next day we woke up and Shuntavia wanted to go home. We all got in my car and I drove her back to Horn Lake and dropped her off at her mother, or her grand mother's home in the Twin Lakes subdivision.

Q: Did you try to help clean up the victim's house?
A: No.

Q: Do you know who did try to clean up the blood evidence in the home?
A: Bo.

Q: Who broke into the victim's slot machine?
A: I don't know, when I say it, there was a key already in it, but I didn't see who broke into it.

Q: What did you do with the items you took from the house?
A: Sold some of the stuff and some of it was at the apartment where we live on Red Oaks.

Q: What is Shuntavia's phone number?
A: I don't know it, the only numbers I know are my mother's and 911.

Q: What is Robert's number is?
A: No, it[']s new, I don't know it.

Q: Did you every hit the victim?
A: I punched him.

Q: What did you do with the clothes you were wearing that night?
A: I was straight, I didn't get no blood or nothing on me, I don't know what Robert and Shuntavia did with their clothes.

Q: What did you get personally from the split of the items taken from the house?
A: I told you me and Robert were together, so the only thing I got was what I had grabbed.

Q: Did you tell anyone about what had occurred at the house?
A: No.

Q: Did you give this statement freely and voluntarily without any threats, promises or coercion?
A: Yes

Q: Is there anything you wish to add to this statement that may be helpful in this investigation?
A: No.

Sergeant Kelly confirmed that the Defendant became sick and had "thrown up" after she had provided her statement. At this point, the Defendant informed the officers that "she was pretty sure that she was pregnant and that's why she had gotten sick." Asked whether the statement in her motion to suppress alleging that she became sick and threw up as a result of being highly intoxicated was true, Sergeant Kelly stated

> Absolutely not. She was clear headed, she was giggly, she was personable. Personable to the point that if it was different circumstances, you know, we may have been able to bond on some other level, but she was a very personable person.

Sergeant Kelly was responsible for reducing the Defendant's statement to writing and confirmed that as he typed the statement on the computer, the Defendant was able to review it on a dual monitor. She was permitted to make any corrections to the statement; however, he did not recall that any corrections were made. The Defendant signed each page of the statement and affirmed that it was true and correct. Sergeant Kelly affirmed that the Defendant was "pretty confident" throughout the entirety of the statement.

On cross-examination, Sergeant Kelly agreed that he came into contact with the Defendant at approximately 3:03 a.m. Asked if the Defendant appeared to be in a jovial mood and to clarify his prior testimony that the Defendant did not appear to take the situation seriously, Sergeant Kelly replied

> She knew the seriousness of the matter. I won't sit here and categorize her as being – taking it lightly. But, she was, after speaking with

her and just keeping it real with her, she relaxed and became a little bit more of a free spirit, a little bit more talkative.

. . . .

No what I was saying, I guess it depends on what level you looked at it at. She knew it was a serious matter, but at some point there was times when, I guess, she did not realize the serious[ness] of the situation, which is part of the reason why we went through what the degrees of, the levels of murder were in the State of Tennessee. But, there was a point where, I guess, if somebody on the outside looking in would have maybe thought she was not taking it totally seriously.

He agreed that he noted differently in his written supplement to the case which documented that the Defendant appeared to be in a jovial mood and not taking the matter seriously. He denied that her behavior was "bizarre" and explained "that's not the first time that that's happened. People react to different situations in different ways." He clarified the context in which the Defendant asked for "reassurance" and explained she said she would be truthful if he promised her "that she wasn't going to jail for a long period of time. And [he] told her that [he] couldn't make that promise . . . . [He] told her that [he] was not the person that passes judgment, [he] [is] a secretary with a gun, [he] take[s] statements." He reiterated that the Defendant threw up after he had provided her with "peanut crackers and water." On redirect examination, Sergeant Kelly testified that the Defendant did not appear to need medical attention, nor did she request medical attention after she became sick.

After a thorough and extensive oral ruling finding that the Defendant's statement was voluntarily and intelligently given, the trial court denied the Defendant's motion to suppress.

**Trial.** Jimmie Blanchard, the victim's older brother, testified that he grew up with his brother, who was nicknamed, "Uno." Blanchard[3] identified two photographs of the victim, which were admitted into evidence. Blanchard recalled the last time he saw the victim was on a Friday night in April 2015. He said they had gone out to eat and had plans to see each other again later that night at a nightclub. When the victim did not show up as planned and failed to respond to phone calls, Blanchard became worried that something was wrong. Two days later, Blanchard entered the victim's apartment with

---

[3] We acknowledge that we do not use titles when referring to every witness. We intend no disrespect in doing so. Presiding Judge John Everett Williams believes that referring to witnesses without proper titles is disrespectful even though none is intended. He would prefer that every adult witness be referred to as Mr. and Mrs. or by his or her proper title.

the aid of the landlord and a police officer and found the victim's lifeless body. After the police investigation of the victim's home, Blanchard returned and discovered several items were missing. Blanchard identified the victim's PlayStation video game, which had unique "blue joysticks with Titan" markings. Both items were marked and later entered as exhibits at trial. He also identified a Samsung IPad tablet and two guns, a Taurus .357 Magnum revolver with live rounds and a Magnum .38 caliber special pistol, all of which belonged to the victim. Although Blanchard did not know the serial number of the guns, he identified them based upon their distinctive features including their "rusty-silver look" and the "snub-nose barrel." He confirmed that the victim sold marijuana, but he did not know how long he had done so. He also did not know whether the victim sold marijuana from his home.

Cortney McKinney, the victim's friend, testified and described the last time he saw the victim in April 2015. He was at the victim's home around ten in the evening watching a basketball game along with several other co-worker friends. He confirmed that he bought marijuana from the victim and had smoked it while at the victim's home. He said there were three other individuals he did not know who were also present that night, a male and two females. He said everyone seemed to be having a good time, and he and his co-worker friends left around eleven that night. The only other people who remained at the victim's home when they left were the three people he did not know. He identified photographs, exhibits 9 and 10, previously shown to him by the police as containing three different screenshots of the individuals who were at the victim's home that night. Exhibit 9 is a photograph of Louden, whom McKinney said he had previously seen at the victim's home. Exhibit 10 contained a photograph of the two other individuals. He denied that an argument between the victim and Louden occurred, and he explained that it was more of a "joke" or "misunderstanding." He also confirmed that Louden and the victim were "kind of dating."

Officer David Smith of the Memphis Police Department (MPD) crime scene investigation unit testified that he responded to a homicide investigation call on April 20, 2015, at 5346 Airview, Memphis, Tennessee. He identified several photographs taken of the outside of the victim's home which showed there was no forced entry into his home. He also identified three diagrams of different angles of the interior of the victim's home. He further identified several photographs taken of the interior of the victim's home as well as physical evidence he recovered from the victim's home. Specifically, he identified a photograph of shattered glass from a liquor bottle in the living room on the couch and a photograph of the victim laying on the kitchen floor in a pool of blood with a tool box across his head. A mop was also recovered from the kitchen, the sponge portion of which was soaked in blood.

In April 2015, Tyquisha Redmond, the Defendant's sister, lived in the Germantown Falls apartment complex with her then-fiancé, now-husband, Damarco Carodine, and the Defendant and co-defendant, Robert Belt. Redmond was the leaseholder of the apartment and had lived there since December 2015. She said the Defendant and Belt had moved in late February 2015 and had been helping her to pay the bills. Although she did not know the victim personally, she "knew of him" because her brother bought marijuana from him. Prior to this offense, the Defendant called Redmond and asked to speak to her husband. Redmond said the Defendant wanted to get a gun to "hit a lick," which meant to try and rob someone. Redmond did not provide her with a gun, and, to her knowledge, neither did her husband. After she learned of the victim's death, Redmond provided a statement to police in which she stated that the Defendant "wanted to rob a dope dealer her friend, Shunta, was messing with." She confirmed that her husband called the police to their home to retrieve items that were not in her home prior to the offense including (exhibits 6,7, the PlayStation (Gameboy system)). She also identified the Advice of Rights form and a photographic array in which she identified co-defendant Robert Belt. She later found the IPad tablet (exhibit 5) which did not belong to her in her laundry room, and she called the police to her home to recover it. She opened the tablet and saw photos of the victim.

Damarco Carodine testified consistently with the testimony of his wife, Tyquisha Redmond. He spoke with the Defendant about a gun for a robbery "a couple of days" prior to when he called the police in this case. The same day he called the police, Carodine had a conversation with co-defendant Belt about selling guns. Carodine testified that co-defendant Belt asked him to sell some guns, and he agreed. Carodine testified that co-defendant Belt told him that "he got [the guns] doing a robbery." Carodine nevertheless proceeded to help co-defendant Belt sell the guns. During the drive to meet the buyer for the guns, co-defendant Belt told Carodine of his involvement in the robbery. He said he hit the victim in the face with a glass bottle and that he stuck him in the head with a screwdriver. Co-defendant Belt attempted to clean up the scene by pouring water on the floor to get rid of the shoe prints. Carodine said the gun deal failed because Belt wanted "too much" money for the guns. Carodine spoke with his wife about the incident and called the police. He confirmed that the police eventually came to his home, he gave them permission to search, and they recovered the two guns, a PlayStation 3, and some mason jars. The guns, mason jars, and other items were in the room where the Defendants stayed and were found in a suitcase. He said the PlayStation 3 was found under his bed, where he observed the Defendant put it.

On cross-examination, Carodine admitted that he had initially called "528-CASH," and that he was paid $1000 as a result of his call to the police. He further agreed that after the police told him the items that were missing from the victim's home, he conducted a search of the Defendants' room and personal items. He also agreed that he

did not include the Defendant's inquiry about a gun in his statement to police. On redirect examination, he clarified that the Defendant had asked him to place the PlayStation 3 underneath his bed the morning that he called the police. He also clarified that he did not learn of the details of the robbery until "on the way back from trying to sell" the guns.

Detective Fausto Frias of the MPD homicide unit testified that he was assigned to investigate the victim's death. By the time he arrived on the scene, the victim's home had been secured. During the course of his investigation, he determined that several items were missing from the victim's home including a PlayStation 3, controllers to the gaming system, an IPad tablet, marijuana and money, and two guns. He eventually spoke with Cortney McKinney, who provided him with a social media photograph of Shuntavia Louden. In addition, based on a crime stoppers tip, he eventually spoke with Carodine. He then went to the Redmond apartment and recovered the missing items from the victim's home. He also recovered both Defendant William's and Belt's cellular phone, and approximately $302 from Belt.

Officer Marcus Mosby of the MPD crime scene investigation unit testified that he responded to a call to the Redmond apartment on April 25, 2015. He took various photographs while on the scene of items including a PlayStation 3, two blue remote controls, two tennis shoes, and a black suitcase opened to show a brown purse with a mason jar containing a green leafy substance. He testified that he recovered all the items and tagged them in the property room. The officer was unable to verify the owner of the guns; but he was able to determine that the guns had not been reported stolen. He tested the green leafy substance in the mason jars, which was positive for 37.3 grams of marijuana.

William Merritt, a criminal investigator with the District Attorney General's Office, obtained the IPad tablet from the property room and a search warrant for its content. He provided the tablet to Lieutenant Victoria Harris, an expert in cell phone and data forensics. He also attempted to locate Jack Graves and Casey Rigsby, two individuals who were with Courtney McKinney at the victim's home, but he was unsuccessful. Lieutenant Harris testified that she extracted personal identifying information from the IPad tablet, which was memorialized in a report and admitted as an exhibit at trial. She stated that the IPad tablet had an email account that belonged to Delvinbrown92@gmail.com.

Shuntavia Louden, who was charged with facilitation of first-degree murder and facilitation of especially aggravated robbery for her involvement in this case, testified that she and the victim had been in "sort of like in a relationship, but not like that" for a couple of months prior to the offense. She knew the victim sold drugs and carried a gun.

She had known the Defendant for her entire life and had just recently met co-defendant Robert Belt. On or about April 17, the Defendant called her and asked if the victim would sell her some marijuana. Louden told her yes. The Defendant and co-defendant Belt came to her home and drove to the victim's home. While they were at the victim's home, they began to watch a basketball game. Louden said three other individuals came to the victim's home, bought some marijuana, and eventually left. She testified that they were "just still talking, hanging out, smoking," when co-defendant Belt got up and struck the victim in the head with a "big old Grey Goose bottle." Louden ran outside the house, but she returned for fear of retaliation.

She testified that co-defendant Belt was "tussling" or wrestling with the victim on the couch while the Defendant was "hitting him all up in his face." They stumbled into the kitchen and the victim was trying to get his gun, but he could not reach it. The Defendant asked Louden where the guns were located, and Louden said she did not know. While in the kitchen, co-defendant Belt told the Defendant to get the scissors, and she complied. The Defendant then "started sticking, multiple times, multiple times, multiple times." Co-defendant Belt then told the Defendant to "get the hammer." The Defendant "got the hammer, and all [the victim's] brains just started coming out, like, all of it. You could see everything. He was not responding. He wasn't moving at all." Co-defendant Belt picked up a mop and began to clean up while the Defendant ran around the victim's home. The Defendant took the victim's PlayStation 3, a mason jar where the victim kept his marijuana, and his guns. The Defendant tried to take the victim's television, but co-defendant Belt told her not to because "it would look too obvious."

They left the victim's home and threw away their bloody clothes, the scissors, and the hammer. Louden asked the Defendant and co-defendant Belt to take her home, but they refused and threatened to harm her sister. They went to a hotel, smoked marijuana, and split up the money. Louden received approximately $500, which she claimed co-defendant Belt gave her to keep quiet. They stayed at the hotel until the next morning and the Defendant dropped co-defendant Belt off at "some apartments . . . with the rest of the things" and then took her home. Louden did not tell her mother or call the police because she was afraid and wanted to get an attorney. A week or so after the offense, she turned herself in to the police. She denied "setting up" the victim or knowing that the Defendant and co-defendant Belt intended to rob or kill the victim. She identified both the Defendant and co-defendant Belt at trial. Finally, she acknowledged that she was seven months pregnant at the time of trial, that her indictment for her involvement in this case was pending, and that she had not been promised anything in exchange for her testimony.

On cross-examination, Louden said that the Defendant went into the hotel to rent the room, and she was unaware of whether the Defendant used Louden's identification to

do so. She acknowledged that the offense occurred on her birthday, and that, rather than being with her husband, she was with co-defendant Belt at the victim's home. She clarified that she "used to date" the victim. She initially stated that she gave the $500 back to the Defendant surreptitiously; however, she acknowledged omitting this information from her statement to police.

Charrel Gambill, a court reporter for the State of Tennessee, testified regarding the transcription of the hearing from the July 18, 2017 motion to suppress. Portions of co-defendant Robert Belt's testimony were read to the jury and admitted into evidence at trial. Co-defendant Belt testified that the police found and took photos of items that were located "inside our room, inside of a closet, inside of a suitcase." Detective Robert Wilkie testified consistently with his testimony from the motion to suppress hearing. The Advice of Rights form he provided to the Defendant was admitted into evidence as an exhibit. Sergeant Eric Kelly testified that he prepared the search warrant for the Redmond apartment, which led to the discovery of the victim's possessions. He also testified, consistently with his testimony from the motion to suppress hearing, that he took the Defendant's statement. A redacted version of the Defendant's statement was read to the jury and admitted as an exhibit at trial.

Dr. Kevin Jenkins testified as an expert in the field of forensic pathology. He explained that Dr. Karen Chancellor, the medical examiner who performed the autopsy of the victim, was ill; however, he had reviewed her entire file regarding the victim. Dr. Chancellor's records were properly qualified as business records and admitted into evidence as an exhibit. Several photographs taken during the course of the autopsy illustrating the extent of the victim's injuries were also admitted into evidence as an exhibit. Dr. Jenkins testified that certain injuries on the victim's body were consistent with having been inflicted by scissors, a screwdriver, and a hammer. The toxicology report revealed the victim had 0.1 milligrams of alcohol, 36 nanograms per milliliter of marijuana, and 30 nanograms of oxycodone in his system. Dr. Jenkins testified that the cause of the victim's death was multiple blunt force injuries of the head and sharp force injuries of the head and neck. He stated that the manner of death was homicide.

The State rested its case. Following extensive questioning by counsel and the court, both Defendants elected to testify.[4] Co-defendant Belt, age 26, testified that in April 2015, the Defendant was his girlfriend, and that, while he did not know Shuntavia Louden personally, he knew of her through the Defendant. On the night of the offense, the Defendant drove co-defendant Belt and Louden to the victim's home. Co-defendant Belt testified that prior to that night he had not met Louden or the victim. Co-defendant Belt testified that the purpose of taking Louden to the victim's home was to celebrate her

---

[4] The record reflects that a <u>Momon</u> hearing was conducted for both Defendants.

birthday. He said they smoked marijuana and drank alcohol. He agreed that while at the victim's home, the victim and Louden began "checking each other." He claimed that it "[k]ind of, sort of, [got out of hand]" but it did not result in a fight. According to co-defendant Belt, shortly after midnight, he and the Defendant left the victim's home, went to their apartment, and did not return to the victim's home. Louden remained at the victim's home with the victim. Co-defendant Belt denied Louden's version of events and denied killing the victim. He said he had owned the PlayStation 3 and the guns for some time prior to the offense. He also denied having any conversation with Demarco Carodine regarding the sale of guns. Co-defendant Belt claimed that Louden gave the Defendant the IPad, which she had had for two or three weeks prior to the offense, to do online employment applications.

On cross-examination, co-defendant Belt agreed that at the time of the offense he was unemployed and sold marijuana to make ends meet. He agreed that he had been advised of rights and had provided a statement to police following his arrest.

The Defendant, age 25, testified and confirmed, in large part, the testimony of Loudon. She also adopted the version of her statement previously testified to by Sergeant Kelly, with minor modifications. The Defendant agreed that she called Louden on the night of the offense, and they went to the victim's home, with the intent to buy marijuana from him. She denied smoking marijuana that night; however, she conceded that they watched a basketball game while others smoked marijuana and drank alcohol. She said that Louden and the victim argued that night, but she did not know what it was about. She said, "out of nowhere," the victim said, "if somebody try to do something, he going blow they ass off." She explained that they did not have any weapons, but co-defendant Belt then "hit [the victim] in the head with a bottle[.]" Although she did not see the victim with a gun, she believed he was "going for his gun" based on what Louden had told her. She then testified, "I'm sorry. I'm sorry. I had – I had hit—I had hit him in the head [with the hammer]." She further explained as follows:

> I'm sorry, y'all, but – it just happened so fast. I don't know how many times, 'cause I wasn't even counting. I can't say the force I put on there, but that's all that – that's all I did. I wasn't looking out for nobody else. I was just thinking about myself, because the way it had happened, like, for him to get hit, and tussling, and him having a gun, I mean, I was afraid for my life.

She denied going to the victim's home intending to rob him and asking Redmond for a gun prior to the offense. She denied stabbing the victim with scissors or a screwdriver or throwing a toolbox on his head. She confirmed that co-defendant Belt tussled with the victim, during which Louden shouted that the victim had a gun.

- 13 -

Although she denied taking the victim's money, she agreed that she took the victim's PlayStation 3 and the IPad as they were leaving his home. She said they left the victim's home, went to the Walmart, and then to the hotel. She disputed Louden's testimony regarding Louden's reluctance to go with them or to take a portion of the victim's money. She eventually returned to the Redmond apartment, where she stored the items taken from the victim's home. She said that she had smoked more than one blunt of marijuana prior to providing the statement to police.

The only part of the Defendant's statement which she claimed was untrue concerned "the driving around part" and "the toolbox part." She explained that they did not buy the marijuana and leave that night, as she noted in her statement. She also denied handing co-defendant Belt the toolbox to hit the victim in the head; but, she insisted that she struck the victim with the hammer before the toolbox was thrown on the victim's head. She also stated that the hotel room was rented in Louden's name, contrary to her statement to police. She agreed that she omitted the "blow your ass off" statement she attributed to the victim from her statement to police. Although she did not see the victim with a gun, she believed he had one during his struggle with co-defendant Belt. The Defendant insisted that she struck the victim in the head "on accident." Her original statement, without redaction, was admitted as an exhibit to her testimony at trial.

The Defendant was convicted as charged, and the trial court imposed an effective sentence of life plus twenty years' imprisonment. Following the denial of her motion for new trial, the Defendant filed a notice of appeal and is now properly before this court for review.

## ANALYSIS

**Motion to Suppress.** The Defendant argues that the trial court erred in failing to grant the motion to suppress her statement because she was "so impaired that her confession cannot be considered the product of a free mind." In response, the State contends, and we agree, that the trial court properly determined that the Defendant's statement was voluntarily given and therefore properly denied the motion to suppress.

The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Tennessee Constitution provides "that in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Under the Fifth Amendment, a confession is involuntary when it is the result of coercive action on the part of the State. Colorado v. Connelly, 479 U.S. 157, 163-64 (1986). Because "coerced confessions are inherently unreliable," only voluntary confessions are

admissible.  State v. Climer, 400 S.W.3d 537, 567 (Tenn. 2013).  In order for a statement to be voluntary, it "'must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence.'"  State v. Kelly, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).

Whether a confession is involuntary is a question of fact.  State v. Willis, 496 S.W.3d 653, 695 (Tenn. 2016) (citing State v. Sanders, 452 S.W.3d 300, 305 (Tenn. 2014)).  The State has the burden of establishing the voluntariness of a confession by a preponderance of the evidence.  Id. (citing Sanders, 452 S.W.3d at 305).  "The test of voluntariness for confessions under article I, § 9 of the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment."  State v. Smith, 933 S.W.2d 450, 455 (Tenn. 1996); accord State v. Freeland, 451 S.W.3d 791, 815 (Tenn. 2014).  "The due process voluntariness test is distinct from Miranda."  State v. Davidson, 509 S.W.3d 156, 189 (Tenn. 2016) (citing Dickerson v. United States, 530 U.S. 428, 434-35 (2000); Mincey v. Arizona, 437 U.S. 385, 397-98 (1978)).  "[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion."  Id. (citing Freeland, 451 S.W.3d at 815).  The voluntariness test requires this court to assess the psychological impact on the accused and to evaluate the legal significance of the accused's reaction.  Id. (citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)).  When determining whether a confession was made voluntarily, this court must examine the totality of the circumstances, including the "characteristics of the accused and the details of the interrogation."  Id. (citing Dickerson, 530 U.S. at 434).  These circumstances include:

> "[T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse."

Climer, 400 S.W.3d at 568 (quoting State v. Huddleston, 924 S.W.2d 666, 671 (Tenn. 1996)).

In denying the motion to suppress, the trial court engaged in a thorough analysis of the proof adduced at the hearing and issued an extensive oral ruling, reasoning, in relevant part, as follows:

> And [the Defendant] did sign [the waiver of Miranda rights form]. She indicated what her social security number was, indicated how far she had gotten in school, twelfth grade through the Job Corp. It appears to be Oregon, but I'm really not certain what that word is.
>
> And also indicated her social security number. Did tell the police which is reflected on the advice of rights that she did smoke on blunt of marijuana at 11:00 p.m., she was feeling no affects at this time.
>
> Before she signed this statement- and this statement started at 4:45 a.m., when she told Sergeant Wilkie and Sergeant Kelly, on two occasions that she did not want to speak to Sergeant Wilkie. The statement started at 4:55 a.m., signed at 5:54 a.m.
>
> She was also given her rights, again, that I'm going to ask you some questions regarding the above complaint. You have the right to remain silent and anything that you say can be used against you in a Court of law
>
> . . . .
>
> And she was asked whether or not she understood the rights that were explained to her and she indicated yes by signing her initials to that and the top of the second page of the statement asks, having these rights in mind do you wish to talk to us now and [the Defendant] indicated yes, again, by signing her initials to that form.
>
> . . . .
>
> The caselaw would indicate the defendant's right to counsel and right against self[-]incrimination may be waived, as long as the waiver is made, voluntarily, knowingly, and intelligently.
>
> And the Court has to look at the totality of the circumstances. And the totality of the circumstances include, amongst other things for the record, [the Defendant's] date of birth is December [], [XXXX], at the time she gave this statement to the police. [The Defendant] would have been thirty-two years of age, would have turned thirty three in December.

And, at the time she gave this statement, the Court has to consider, rather, her age and the background of the defendant, her education and intelligence level, whether or not she can read and write. The demeanor and responsiveness to the question, any prior experience with the police, any mental disease, or disorder, any intoxication at the time of the waiver and the manor and detail and language in which these rights were, in fact, explained to [the Defendant].

. . . .

Sergeant Kelly indicated that she was not under the influence of intoxicant, as Sergeant Wilkie did, also. That even though she admitted that she smoked a blunt some three or two and a half hours earlier, there was no indication that she was under the influence of drugs, or alcohol, no odor of alcoholic beverages and had [the Defendant] been under the influence of any drugs, or alcohol they would not have taken a statement from her.

[The Defendant] apparently, at some point, did throw up during the course of this interview and indicated to the police that she threw up because she thought she was, maybe, pregnant, but it did not influence, or was not affecting her ability to talk to the police when they took this statement from her.

This Court has to consider when the issue of intoxication is raised as to whether or not an accused faculties are so impaired that a confession cannot be considered to be a product of a free mind and rational intellect that it should be suppressed. The test is whether at the time of the statement the accused was capable of making a narrative of the events, or of telling his, or her own participation in a crime.

And that is pursuant to State versus Bell, B-E-L-L, 690 SW2d, page 879, 1985 Court of Criminal Appeals opinion and the defendant's statement is not considered involuntary based only on a defendant's use of narcotics, or whether or not the person is, in fact, addicted to drugs.

The law in the State of Tennessee is well established that the ingestion of drugs and alcohol does not in and of itself render a subsequent confession, involuntary and that is Sate versus Morris, M-O-R-kel-S, 21S\r2d, page 788, 2000 Tennessee Supreme Court opinion.

- 17 -

And, when it comes to the Court making a determination as to whether or not a defendant, even though, may have smoked, or may have consumed some alcohol, or may have smoked some marijuana, the test is whether or not at the time of the statement [the Defendant] was capable of making a narrative of events, or stating her participation in this crime.

. . . .

On page two of her statement she was asked in her own words, "Explain the events that took place during and after this incident?" And, [the Defendant] gave a long narrative about what she and Shuntavia, had done.

. . . .

And, this statement goes on and on and on, but that is a narrative of "Describe in your own words what happened prior to and during the course of this crime", and this is a very detailed narrative in which [the Defendant] has told the police, in detail, after been given her Miranda rights exactly what she did, what Shuntavia did, what Robert Belt allegedly did and this Court finds that [the Defendant] was, in fact, advised of her rights and she intelligently, knowingly and voluntarily waived her right to remain silent.

. . . .

This [D]efendant may have had marijuana to smoke, she may actually be addicted to drugs, I don't know, it is not on the record. But, there is nothing about this statement that would indicate that she was so under the influence of intoxicant that she was confused about her rights and that she was not capable of making a narrative about her involvement in this crime.

The narrative that she made shows, unquestionably, that she was in fact, thinking clearly. Sergeant Kelly indicated that her behavior was little bit "giddy", or a little bit inappropriate and maybe she did not understand the seriousness of the situation in which she found herself, but Officer Kelly told the Court that that behavior is not unusual, because different people act differently when he has questioned most folks regarding their participation or less participation in a homicide.

And, this Court finds that [the Defendant] was advised of her rights on two different occasions. She intelligently, knowingly, voluntarily waived those rights, gave a statement of her own volition to Sergeant Kelly, was given the opportunity to make changes, which she did not make any changes in this statement and this Court will deny this motion to suppress this statement that [the Defendant] gave to the police for the reasons as stated.

We begin our resolution of this issue by recognizing that, "[i]ntoxication alone does not bar the introduction of a confession if the accused was capable of understanding [her] rights." State v. Bell, 690 S.W.2d 879, 882 (Tenn. Crim. App. 1985). In other words, the fact that a person had consumed alcohol or drugs at some point prior to giving a statement to police does not per se render that statement involuntary. Only when the intoxication has so impaired the accused that the confession cannot be considered the product of a free mind and rational intellect should it be suppressed. State v. Morris, 24 S.W.3d 788, 805 (Tenn. 2000) (appendix). The test is "whether, at the time of the statement, the accused was capable of making a narrative of past events or of stating his own participation in the crime." Id.; State v. Buford, No. M2014-01265-CCA-R3-CD, 2015 WL 9488975, at *8 (Tenn. Crim. App. Dec. 29, 2015). Here, the Defendant acknowledged that she had smoked a single blunt of marijuana three and a half hours prior to giving her statement to police. She told the detectives, however, that she was not feeling the effects of the marijuana and agreed to talk with them. She then provided a four-page statement, detailing her involvement in the victim's murder. Within the statement, the Defendant provided a narrative of events, which included explicit details of how the offense occurred and the role everyone played in robbing and fatally assaulting the victim. The detectives who encountered the Defendant testified that she did not appear to be under the influence of an intoxicant prior to, during, and after she provided her statement. Under these circumstances, the Defendant's criminal confession cannot be said to have been induced by her ingestion of a single blunt of marijuana three hours prior to providing the statement. Accordingly, the ingestion of one blunt of marijuana did not vitiate the voluntariness of the Defendant's confession in this case. She is not entitled to relief.

**Sufficiency of the Evidence.** The Defendant next argues generally that the evidence was insufficient to support her convictions of premeditated murder and especially aggravated robbery. She insists that she is not the individual responsible for the crimes and that "there were inconsistencies between the State's witnesses and the defense witnesses that took the stand." The State argues, and we agree, that the evidence was sufficient to support the Defendant's convictions.

- 19 -

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from that evidence. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Sutton, 166 S.W.3d 686, 691 (Tenn. 2005); State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. State v. Campbell, 245 S.W.3d 331, 335 (Tenn. 2008) (citing Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence, and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury. Dorantes, 331 S.W.3d at 379 (citing State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006)). When considering the sufficiency of the evidence, this court "neither re-weighs the evidence nor substitutes its inferences for those drawn by the jury." Wagner, 382 S.W.3d at 297 (citing State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997)).

The Defendant was charged, alternatively, with first-degree murder and felony murder. In order to establish first-degree murder, the State was required to prove that the Defendant committed a premeditated and intentional killing of another. Tenn. Code Ann. §§ 39-13-202(1), (2). In order to sustain a conviction of felony murder, the State was required to establish that the Defendant killed the victim in the perpetration of or attempt to perpetrate any first-degree murder, . . . robbery, burglary, [or] theft[.]" The Defendant was also convicted of especially aggravated robbery which required the State to prove a robbery that was "(1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffer[ed] serious bodily injury." Tenn. Code Ann. §§ 39-13-403(a)(1), (2). Especially

aggravated robbery requires proof of both elements: use of a deadly weapon and serious bodily injury to the victim. See Stewart v. State, 33 S.W.3d 785, 792 (Tenn. 2000). "Robbery" is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2010). "Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (2010). "Serious bodily injury" is defined as "bodily injury that involves: (A) A substantial risk of death; (B) Protracted unconsciousness; (C) Extreme physical pain; (D) Protracted or obvious disfigurement; [or] (E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" Tenn. Code Ann. § 39-11-106(a)(34); State v. Farmer, 380 S.W.3d 96, 100-01 (Tenn. 2012).

Viewing the evidence in the light most favorable to the State, we conclude that any rational trier of fact could have found the Defendant guilty of the offenses of conviction. At some point prior to the victim's death, the Defendant told her sister, Redmond, she wanted to get a gun to "hit a lick," which meant to try and rob someone. After learning of the victim's death, Redmond provided a statement to police in which she stated that the Defendant specifically said that she "wanted to rob a dope dealer her friend, Shunta, was messing with." On the day of the offense, the Defendant called Louden, the victim's girlfriend, and asked if the victim would sell the Defendant marijuana. Louden arranged to go to the victim's home along with the Defendant and her boyfriend, co-defendant Belt. After about an hour of watching television, smoking marijuana, and drinking alcohol, co-defendant Belt struck the victim in the head with a large, glass, Grey Goose alcohol bottle. A struggle ensued, and eventually the Defendant and co-defendant Belt brutally killed the victim by bludgeoning him in the head with a hammer, stabbing him in the neck with a screwdriver, and throwing a toolbox on top of his head. Louden, an eyewitness to the killing, testified at trial and confirmed that the Defendant killed the victim, ransacked his home, and took a PlayStation 3 and an IPad. The victim's belongings were found in the Defendant's apartment. The Defendant also provided a statement of admission to police, detailing her involvement in the victim's death. Finally, the Defendant testified at trial that she killed the victim, took his belongings, and shared in the money that was taken from the victim. There was overwhelming proof supporting the Defendant's convictions in this case. She is not entitled to relief.

## CONCLUSION

Based on the above authority and analysis, the judgments of the trial court are affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE